# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DOCKSIDE DEVELOPMENT CORPORATION, ) ) ) | |
| Plaintiff, ) ) | No. 06 C 1096 |
| ) | Consolidated with |
| v. ) | Case No. 06 C 1167 |
| ) | |
| ILLINOIS INTERNATIONAL ) | Judge Joan B. Gottschall |
| PORT DISTRICT, ) | |
| ) | |
| Defendant. ) ) | |

## MEMORANDUM OPINION AND ORDER

Dockside Development Corporation ("Dockside") has sued Chicago Regional Port District, N/K/A Illinois International Port District ("Port District") for a declaratory judgment concerning its rights and obligations under a lease between the two corporations for various parcels of land. Port District has filed a motion to dismiss the complaint for lack of federal subject matter jurisdiction and for remand of a related case, No. 06 C 1167, to the Circuit Court of Cook County. For the reasons that follow, the motion to dismiss and remand is granted.

## BACKGROUND

On June 3, 1965, Dockside, entered into two sixty-five year leases with Port District for two parcels of property located at Lake Calumet Harbor, in Chicago, Illinois. On March 7, 1969, the parties entered into a third lease for an additional parcel of land located at the Harbor ("the Harbor"), also owned by Port District.[1] The leased premises were to be operated as a public port

---

[1] Though there are three separate lease agreements at issue, the distinctions between them are irrelevant to the matter at hand. Thus, the leases will collectively be referred to as "lease" or "lease agreement."

and terminal facility "for the purpose of handling for reshipment to and from vessels, barges, rail cars, trucks and/or pipe lines, storing, processing and distributing scrap metal products, steel, lumber and other commodities with the exception of bulk liquids or bulk grain." App. to Compl. Ex. A, Art. 1, § 1.4. Per the lease agreement, Dockside pays Port District an annual rent and, in addition, remits all wharfage and dockage charges collected during the term of its tenancy. As part of its lease obligations, Dockside was to construct a steel dockwall ("wall") and dredge a twenty-seven-foot-deep slip for vessels, specified as "Slip No. 2" ("slip"), by 1970.[2] The lease also provided that once Dockside completed the construction of the slip and the wall, Port District would bear the burden of maintaining the dredging of the slip to a depth of twenty-seven feet and keeping the wall in good order and repair.

On January 9, 1998, Dockside filed a complaint against Port District in the Circuit Court of Cook County, seeking a judicial declaration that Port District had failed to meet its obligation to maintain the slip and the wall. The dispute centered, *inter alia*, on whether Dockside's initial failure to dredge the slip to a depth of twenty-seven feet relieved Port District of its obligation to maintain the slip. After nearly seven and a half years of litigation and appeals, the Illinois state courts concluded that because Dockside had not dredged the slip to a uniform depth of twenty-seven feet, it failed to satisfy the condition precedent that would have given rise to Port District's obligation to maintain the slip and wall. Accordingly, Port District had no obligation to maintain the slip or the wall.

Subsequently, Port District sought to evict Dockside on the ground that Dockside's continued failure to dredge the slip to a uniform depth of twenty-seven feet constituted a material

---

[2] A "slip" is a "docking place for a ship" or "[a] space for a ship between 2 docks or wharves."

2

breach of the lease agreement. Dockside filed this action ("Dockside I") seeking a declaratory judgment that it is not in material breach of the lease agreement, that it has substantially performed under the lease agreement, and that it is not liable to Port District for damages and attorneys' fees related to the prior state court proceedings. Dockside claims that the two-foot difference in dredged depths (the slip is currently dredged to twenty-five feet) is irrelevant to the operation of the slip under the contracts and thus is not material. On March 1, 2006, the day after Dockside filed its complaint against Port District in federal court, Port District filed a complaint in forcible entry and detainer against Dockside in the Circuit Court of Cook County. Dockside successfully moved to have that case removed to federal court as case number 06 C 1167 ("Dockside II") and consolidated with this case. Port District filed a motion to dismiss Dockside I for lack of subject matter jurisdiction and to remand Dockside II to the Circuit Court of Cook County. Port District contends that this court lacks federal admiralty jurisdiction under 28 U.S.C. § 1333(1) because the lease at issue between Port District and Dockside is not maritime in nature.[3]

## ANALYSIS

On a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, the plaintiff bears the burden of establishing that the court has subject matter jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Kontos*

---

Webster's II Dictionary 663 (3d ed. 2005).
[3] The issue of preclusion was barely addressed by the parties and by Port District only in its reply brief, even though, from the court's point of view, there is a substantial likelihood that this case is precluded by the prior state litigation between the parties. Nor did the parties touch on whether what remains of the *Rooker-Feldman* doctrine has any application to this dispute. *See Exxon Mobil Corp. v. Saudi Basic Indus.*, 544 U.S. 280 (2005). In any event, the court believes it should resolve the issue of whether there is federal subject matter jurisdiction before it reaches

3

v. *United States Dep't of Labor*, 826 F.2d 573, 576 (7th Cir. 1987). The court must accept as true all well-pleaded factual allegations, and draw reasonable inferences in favor of the plaintiff. *Rueth v. United States Envtl. Prot. Agency*, 13 F.3d 227, 229 (7th Cir. 1993). Because subject matter jurisdiction focuses on the court's power to hear the claim, however, the court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion; it may look beyond the complaint and review any extraneous evidence submitted by the parties to determine whether subject matter jurisdiction exists. *United Transp. Union v. Gateway W. Ry. Co.*, 78 F.3d 1208, 1210 (7th Cir. 1996).

The federal courts have original jurisdiction, exclusive of state courts, over "any civil case of admiralty or maritime jurisdiction." 28 U.S.C. §1333(1). Admiralty jurisdiction of the federal courts embraces two principal subjects, maritime contracts and maritime torts. The test for determining whether a cause of action arising in tort falls within a court's admiralty jurisdiction is distinct from the test for determining whether a contract dispute falls within a court's admiralty jurisdiction.[4] "The boundaries of admiralty jurisdiction over contracts – as opposed to torts or crimes – being conceptual rather than spatial, have always been difficult to draw." *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961). The general rule remains that a contract is within admiralty jurisdiction if its subject matter is maritime. *Ins. Co. v. Dunham*, 78 U.S. (11 Wall) 1, 26 (1871). As the United States Court of Appeals for the Seventh Circuit articulated in *R. Maloblocki & Associates, Inc. v. Metropolitan Sanitary District of Greater Chicago*, "the only question is whether the transaction relates to ships and vessels, masters and

---

non-jurisdictional preclusion issues.
[4] A party seeking to invoke federal admiralty jurisdiction over a tort claim pursuant to 28 U.S.C. § 1333(1) must satisfy conditions both of location and of connection with maritime activity.

4

mariners, as the agents of commerce, on navigable waters. . . . The contract must be wholly maritime in nature, and relate to trade and commerce upon navigable waters." 369 F.2d 483, 484-85 (7th Cir. 1966) (internal citations omitted) (holding that a contract does not relate directly to navigation simply because its performance "affect[s] navigation"; "the vital question of admiralty jurisdiction is the nature of the transaction"). The United States Supreme Court recently held that in determining whether or not the subject matter of a contract is maritime, the court's analysis must focus "on whether the principal objective of a contract is maritime commerce." *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 25 (2004) (finding intermodal transportation contracts to be maritime contracts "because their primary objective is to accomplish the transportation of goods by sea from Australia to the eastern coast of the United States"). Though the rule seems simple in theory, its application proves to be complicated.[5] This is best illustrated by the oft-cited example that while a contract to *repair* a ship is maritime, a contract to *build* a ship is not. *Kossick*, 365 U.S. at 735. Thus, most courts resort to a case-by-case approach, relying heavily on precedent. *See id.* ("Precedent and usage are helpful insofar as they exclude or include certain common types of contract.").

Courts have generally held that the lease of land intended for use as a wharf by third-party vessels is not a maritime contract for purposes of maritime jurisdiction. *See Upper Steamboat Co. v. Blake*, 2 App. D.C. 51, 57 (1893) ("[T]he lease of a wharf . . . is not a maritime contract, in any proper sense, but is a contract relating to realty."); *see also Beyel Bros., Inc. v. Canaveral Port Auth.*, No. 6:06-cv-7520Orl-31JGG, 2006 U.S. Dist. LEXIS 72580, at *6-7 (M.D. Fla. Oct.

---

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995).
[5] Justice Holmes once noted that "the precise scope of admiralty jurisdiction is not a matter of obvious principle or of very accurate history." *The Blackheath*, 195 U.S. 361, 365 (1904).

5, 2006) (holding that land use contracts do not fall within the court's admiralty jurisdiction even when maritime activity would be performed on the land and the contracts contained language intended to regulate that activity); *Buck Kreihs Co., Inc. v. Bd. of Comm'rs of the Port of New Orleans and Sank, Inc.*, No. Civ. A. 97-0970, 1997 WL 666220, at *3 (E.D. La. Oct. 27, 1997) ("The cases consistently characterize a lease of wharf space as a non-maritime contract."); *Holt Cargo Sys., Inc. v. Delaware River Port Auth.*, No. Civ. A. 94-7778, 1996 U.S. Dist. LEXIS 5323, at *19 (E.D. Pa. Apr. 19, 1996) (holding that the lease of a marine terminal, additional parcels, and cranes did not constitute a maritime contract).

The consistent treatment of such contracts as non-maritime real estate contracts requiring the application of local law rather than maritime contracts requiring the application of federal law suggests that a purpose of admiralty jurisdiction is to provide a uniform source of law and an unbiased forum for seafaring vessels which cannot be expected to familiarize themselves with the local laws of every state they happen to pass into by way of navigable waters. *See Proleride Transp. Sys., Inc. v. Union Carbide Corp.*, 498 F. Supp. 680, 682 (D. Mass. 1980) (the "initial grant [of admiralty jurisdiction] served not only to further maritime commerce, but also to protect litigants by providing a uniform source of law to vessels traveling in interstate commerce and by assuring an adequate forum"); *see also Norfolk*, 543 U.S. at 28 ("Article III's grant of admiralty jurisdiction 'must have referred to a system of law coextensive with, and operating uniformly in, the whole country.'") (quoting *Am. Dredging Co. v. Miller*, 510 U.S. 443, 451 (1994)). Where the disputing parties are two local parties that voluntarily and knowingly entered into a contract for land in a particular state, there is no danger of surprise or prejudice that might arise from the application of local law.

This principle seems to reconcile the otherwise perplexing distinctions the law makes between maritime and non-maritime contracts. For example, some courts have held that contracts for wharfage are maritime contracts that fall within admiralty jurisdiction. *See Ex parte Easton*, 95 U.S. 68, 77 (1877). "Wharfage" is "the fee charged for the temporary use of a dock furnished in the ordinary course of navigation to a ship for the purpose of mooring in safety in order to load and unload cargo, to receive and land passengers, to make temporary repairs and to refuel, resupply and reprovision." *Howmet Corp. v. Tokyo Shipping Co.*, 320 F. Supp. 975, 978 (D. Del. 1971). However, those cases pertain to contracts entered into by owners or persons in charge of ships or vessels for the use of wharves. Wharfage contracts are maritime if wharfage is provided to a specific vessel. *See Royal Ins. Co. v. Pier 39 Ltd. P'ship.*, 738 F.2d 1035, 1037 (9th Cir. 1984). Dockside cites to case law that supports this point. For example, in *Medema v. Gombo's Marina Corp.*, the court held that a contract to store a boat for a winter season fell within a federal court's admiralty jurisdiction but relied, *inter alia*, on the fact that the "storage contract . . . related to an existing vessel." 97 F.R.D. 14, 16 (N.D. Ill. 1982). *See also Sander v. Alexander Richardson Invs.*, 334 F.3d 712, 715 (8th Cir. 2003) (applying admiralty law to a dispute between a yacht club and boat owners over a slip rental agreement).

Notably, even when the contract at issue pertains to a specific vessel, the analysis does not end there – courts have found that admiralty jurisdiction is properly invoked for wharfage contracts only when the implicated vessel is seafaring. "Admiralty is limited to vessels actively in navigation or only temporarily withdrawn." *Mammoet Shipping Co., B.V. v. Mark Twain*, 610 F. Supp. 863, 866 (S.D.N.Y. 1985) (no admiralty jurisdiction over a contract for the lease of dock space for a riverboat that had been renovated for use as a restaurant and showboat); *see also*

7

*Goodman v. 1973 26-Foot Trojan Vessel, Arkansas*, 859 F.2d 71, 73 (8th Cir. 1988) (noting that "[u]nder the dead ship doctrine, a ship loses its status as a vessel when its function is so changed that it has no further navigation function" but distinguishing "dead ships" from ships that have been temporarily withdrawn from service). In such cases, where a vessel becomes more like a permanent resident than a passing traveler, it cannot be said there is a need for uniform law to prevent prejudice or surprise. Therefore, the relevant question is not whether performance of a contract "affects" boats, navigation or waterways. The question is whether the regulation of the rights, obligations and liabilities of the parties, as between themselves, requires federal law either to protect the parties from prejudice or preserve the uniformity of admiralty law. A court should not assert admiralty jurisdiction over a contract for real estate unless there is a direct link between the contract and the operation of a seafaring vessel, thereby invoking the need for uniform federal law. With these considerations in mind, the court turns to the case at hand.

Dockside argues that the contract at issue is maritime in nature because it "deal[s] expressly with the construction, operation and dredging of part of a large, international port." Mem. in Supp. Dockside's Resp. at 4. It further argues that the contract "deal[s] with" receiving or shipping freight, wharfage and dockage charges, and the dredging and maintenance of a slip. *Id.* Dockside's arguments are unavailing for the following reasons.

First, the principle objective of the contract here is to lease various parcels of land to Dockside. Dockside's attempt to paint it as a contract that "deal[s] with" traditionally maritime subjects such as receiving or shipping freight, wharfage and dockage charges is belied by the actual contract, which is a *lease* for land. *See* Compl. Ex. A ("Sixty-Five Year Lease Between Chicago Regional Port District and Dockside Development Corp.") Each lease provides that

Dockside will pay rent to Port District, outlines the limitations of Dockside's use of the land, and assigns certain rights and obligations to each of the parties. Although the parties may have contemplated the use of the land for maritime services – such as receiving and shipping freight by third parties – that use is ancillary to the primary purpose of the contract, which is an agreement by Port District to lease parcels of land to Dockside. Thus, the nature of the transaction lies in real estate, not in admiralty law. *See Upper Steamboat Co.*, 2 App. D.C. at 56 ("[T]he lease of a wharf . . . is not a maritime contract, in any proper sense, but is a contract relating to realty."); *Buck Kreihs Co., Inc.*, 1997 WL 666220, at *3 (holding that an agreement to rent, use and occupy wharf space does not "transform" into a maritime action just because the work performed on the wharf is maritime); *Proleride Transp. Sys., Inc.*, 498 F. Supp. at 682 (declining to expand admiralty jurisdiction to "an assignment that is in its essence a lease of real estate"); *see also Beyel Bros., Inc.*, 2006 U.S. Dist. LEXIS 72580, at *6-7; *Holt Cargo Sys., Inc.*, 1996 U.S. Dist. LEXIS 5323, at *19.

Second, Dockside has not cited – and the court is unable to find – a single case that supports the proposition that a dispute between the lessor and lessee of a parcel of land to be used as a slip on navigable waterways is to be governed by admiralty law. Instead, Dockside relies heavily on the fact that the lease involves "wharfage," citing to a number of cases that are factually inapposite to the case at hand. The agreement at issue is not primarily an agreement for wharfage; it is a lease that directs the distribution of wharfage fees paid by third parties between Dockside and Port District. The lease provides that "[i]n addition to said fixed annual rental, the Lessee shall (except as otherwise herein provided), pay to the Lessor all warfage [sic] and dockage charges." App. to Compl. Ex. A, Art. II, § 2.2. There is no specific boat or vessel

implicated by or referenced in the lease. More importantly, Dockside pays rent to Port District regardless of what ships, if any, come to berth at the slip. *See, e.g., The James T. Furber*, 157 F. 126, 129 (D. Me. 1907) (finding an agreement for wharfage rights to a vessel to be non-maritime because, among other things, rent was payable whether or not the wharf was used); *Upper Steamboat Co.*, 2 App. D.C. at 57 (distinguishing between a demand for wharfage "as understood in the laws and usages of navigation" and a claim for rent of a wharf that creates a landlord/tenant relationship). Thus the primary purpose of the contract between Dockside and Port District is not for wharfage.

This logic also obviates Dockside's argument that the contract "deals with" "dredging," the process of deepening waterways.[6] The primary purpose of this contract is not dredging; Port District did not hire Dockside to dredge a waterway. Rather, the reference to dredging in the lease simply embodies the understanding that Dockside, rather than Port District, will bear the expense of dredging the slip as an incident to its lease obligations. Although the dredging of a navigable waterway may have an effect on navigation, this is not dispositive of the jurisdictional issue. For example, in *Maloblocki*, the Seventh Circuit held that a contract dispute over the dredging of a river was not a maritime contract. 369 F.2d at 483. The Metropolitan Sanitary District of Greater Chicago ("MSDGC"), by virtue of its responsibility for sewage disposal and control of water drainage in Chicago, entered into a contract with plaintiff for the removal of silt

---

[6] The general rule is that dredges engaged in work in furtherance of navigation are vessels subject to maritime law. *See, e.g., In re Hydraulic Steam Dredge No. 1*, 80 F. 545, 557 (7th Cir. 1897) (dredge engaged in removing earth from lake bed not engaged in maritime employment that would subject it to admiralty jurisdiction); *North American Dredging Co. v. Pacific Mail S. S. Co.*, 185 F. 698, 702 (9th Cir. 1911) ("A floating dredger capable of carrying her own machinery and implements and working crew, when employed as an aid to commerce in deepening navigable channels and harbors, is subject to the maritime law and to a maritime lien for a

10

and overburden from the bed of a river. *Id.* at 484. Some time after the work was commenced, MSDGC ordered a shutdown of the work. Plaintiff claimed this was a breach of contract and sued for damages in federal court. *Id.* The lower court dismissed the action for lack of subject matter jurisdiction. Though plaintiff argued that the contract's performance affected navigation and could be achieved only with vessels engaged in navigation, the Seventh Circuit reasoned that this was insufficient to invoke federal jurisdiction because the purpose of the contract, as it was known to the plaintiff, was "flood control." *Id.* at 488. Though the contract may have had an effect on the enlargement or deepening of the channel, the purpose of the contract was not "wholly maritime." *Id.* Here too, though the contract may have an effect on navigation, the purpose of the contract is not wholly maritime.

Dockside also relies on a number of cases involving tort claims for its proposition that courts "have consistently sustained admiralty jurisdiction over disputes concerning boat slip lease agreements." Mem. in Supp. Dockside's Resp. at 3. Specifically, Dockside cites to *Onebeacon Insurance Group v. Great Lakes Inn Management, Inc.*, 235 F. Supp. 2d 940 (E.D. Wis. 2002) and *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995). However, as stated above, it is well-established that the test for determining whether a cause of action arising in tort falls within a court's admiralty jurisdiction is distinct from the test for determining whether a contract dispute falls within a court's admiralty jurisdiction. Since neither of the cases cited by Dockside reached the question of whether a court could exercise admiralty jurisdiction over a contract dispute concerning boat slip lease agreements and as there are no tort

---

tortious injury to another vessel caused by negligence of those controlling her operations.").

claims asserted in this case, those citations are entirely inapposite.[7]

Thus, the court is not persuaded that "maritime commerce" was meant to encompass disputes over real estate contracts for land between two local parties[8] without reference to a particular vessel or ship. Federal law is not necessary to resolve what is, in essence, a local dispute.[9] Though it is true vessels are affected by the operation of ports and by the depth of slips in which they berth, neither those vessels nor their owners are before the court today. Port District's motion to dismiss Dockside's complaint (Dockside I) is granted.

When a federal claim is dismissed, the court should relinquish supplemental jurisdiction over any remaining state law claims. The court lacks subject matter jurisdiction over Dockside II, which was removed to this court based on Dockside's allegations that the action fell within the court's admiralty jurisdiction and should have been filed as a 13(a) compulsory counterclaim to Dockside 1. Dockside's Notice of Removal. 28 U.S.C. § 1447(c) provides "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." *Smith v. Wisconsin Dept. of Agric., Trade & Consumer Prot.*, 23 F.3d 1134, 1139 (7th Cir. 1994) (holding that the proper action for a district court lacking subject matter

---

[7] Similarly, the court fails to see the relevance of the Supreme Court's holding in *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 611 (1991), a case Dockside cites as "dispositive." The Court in *Exxon Corp.* overruled the precedent excluding agency contracts from admiralty jurisdiction, holding that "[r]ather than apply[ing] a rule excluding all or certain agency contracts from the realm of admiralty, lower courts should look to the subject matter of the agency contract and determine whether the services provided under the contract are maritime in nature." *Exxon Corp.*, 500 U.S. at 612. Besides its plain holding on agency contracts, this court does not view the Supreme Court as having changed the law as to what contracts are maritime in nature.
[8] Both parties in this matter are Illinois corporations with their primary places of business in Chicago, Illinois. Compl. ¶¶ 4-5.
[9] This is most aptly demonstrated by two observations: (1) Dockside previously brought a suit against Port District regarding contractual obligations over the very same lease agreements and slip in Illinois state court and (2) there is no indication anywhere in the contracts that the parties

jurisdiction over a claim is to remand it to state court). Because the court does not have subject matter jurisdiction over Dockside II, it is remanded to state court.

## CONCLUSION

For the foregoing reasons, Port District's motion to dismiss and remand is granted.

ENTER:

_/s/_____
JOAN B. GOTTSCHALL
United States District Judge

Dated: March 26, 2007

---

contracted with each other in contemplation of the general system of maritime law.